

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-76,923

---

**RICKEY DONNELL CUMMINGS, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON DIRECT APPEAL
### FROM CAUSE NO. 2011-1513-C1 IN THE 19TH DISTRICT COURT
### McLENNAN COUNTY

---

**KEASLER, J., delivered the opinion of the Court, in which KELLER, P.J, and MEYERS, WOMACK, HERVEY, COCHRAN, and ALCALA, JJ., joined. PRICE, J., filed a concurring and dissenting opinion. JOHNSON, J., concurred.**

## O P I N I O N

Rickey Cummings was convicted of capital murder for the March 2011 murders of

Keenan Hubert and Tyus Sneed during the same criminal transaction.[1] Based upon the jury's

answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071,

---

[1] *See* TEX. PENAL CODE § 19.03(a)(7)(A).

§§ 2(b) and 2(e), the judge sentenced Cummings to death.[2] Direct appeal to this Court is automatic.[3] Cummings raises nine points of error. We find them to be without merit and affirm the trial court's judgment.

In his first point of error, Cummings claims that the judge violated his Fifth, Eighth, and Fourteenth Amendments rights under the United States Constitution during the punishment phase by excluding mitigating evidence relevant to Cummings's background. At trial, Cummings sought to introduce the testimony of Amy Nguyen, who purported to be an expert in "the health of the community overall." Nguyen's proposed testimony would note risk factors within the communities in which Cummings grew up and explain how those factors could have influenced him to commit an act of violence. Nguyen's testimony would not address Cummings's actual home environment, education, income level, or social history. Instead, her testimony would solely concern the number of single-parent homes, education, income levels, and crime data specific to neighborhoods in which Cummings had resided at any time from his birth until he committed the instant crime. The State objected that (1) Nguyen's testimony was not relevant because it was not tailored to Cummings in particular, and (2) Nguyen was not qualified as an expert.

Texas Rule of Evidence 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, [then] a witness

---

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *Id.* § 3(h).

qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.

Before admitting expert testimony under Rule 702, the judge must satisfy himself that: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case.[4] These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance.[5] Here, Cummings argued that Nguyen's testimony was relevant mitigating evidence under the Eighth Amendment. The judge sustained the State's objection, holding that he did not find the evidence relevant. Assuming without deciding that the evidence was relevant, we hold that Cummings failed to show that Nguyen was qualified to testify as an expert.

Qualification of an expert is a two-step inquiry.[6] A witness must first have a sufficient background in a particular field, and a judge must then determine whether that background goes to the matter on which the witness is to give an opinion.[7] The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular

---

[4] *Alvarado v. State,* 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995).

[5] *Vela v. State,* 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

[6] *Id.*

[7] *Id.*

subject.[8] Because the spectrum of education, skill, and training is so wide, a trial judge has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case.[9]

At trial, Cummings proffered Nguyen as an expert in "community risk factors" and how those factors might influence a person growing up in particular communities. Nguyen testified on voir dire that she has a degree in Physical Science and a Master-level certification in Geographic Information Systems. However, she acknowledged that she did not hold any social-science degrees such as social work or anthropology. Nguyen also acknowledged that the basis for her testimony would be limited to a Department of Justice (DOJ) study and census data. She did not participate in the DOJ study, and there was no evidence that she had ever prepared any such studies or analyses. Nguyen knew nothing about Cummings, his family, his education, his income level, or background aside from the specific addresses at which he resided from birth to present day. Cummings failed to show Nguyen was qualified to testify regarding how "community risk factors" could have influenced Cummings to commit an act of violence.

On appeal, Cummings argues that Nguyen's testimony was relevant because it "fell within the broad field of criminology." However, Cummings did not make this argument at

---

[8] *Id.* at 132.

[9] *Id.* at 136.

trial and, therefore, failed to preserve it for review.[10]  Even if Cummings had preserved that argument, he still had the responsibility to show that Nguyen was an expert in the relevant field for which he proffered her testimony.[11]  But Nguyen never purported to be an expert in criminology, and Cummings provided no evidence that Nguyen had any expertise in that field or any social sciences pertinent to the effect of "community risk factors" on a defendant's future dangerousness or in mitigation.  The judge did not abuse his discretion in excluding Nguyen's testimony.[12]  Point of error one is overruled.

In point of error two, Cummings alleges that the judge erred in overruling his *Batson v. Kentucky*[13] challenge to the State's use of a peremptory challenge against African-American venireperson Cynthia Cobb.  Cummings specifically contends that the State waived any argument that he failed to meet the initial *Batson* requirement of establishing a prima facie case of discrimination.  Therefore, he asserts that this Court should abate his appeal and remand his case to the trial court to conduct a proper *Batson* hearing addressing the remaining steps of the *Batson* inquiry.

In *Batson*, the United States Supreme Court outlined an analytical tool for testing challenges to the State's use of peremptory challenges. Initially, the defendant must establish

---

[10]  TEX. R. APP. P. 33.1(a).

[11]  *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010).

[12]  *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010) (reviewing trial court's ruling on admissibility under an abuse-of-discretion standard).

[13]  *Batson v. Kentucky,* 476 U.S. 79 (1986).

a prima facie case that the State exercised its peremptory challenges in a discriminatory manner.[14] The burden then shifts to the State to articulate race-neutral explanations for its questioned challenges, which the defendant may rebut.[15] Finally, the judge must determine whether the defendant has carried his burden of proving purposeful discrimination by the State.[16] A reviewing court should not overturn the judge's resolution of the *Batson* issue unless it determines that the judge's ruling was clearly erroneous.[17]

The record shows that Cummings and the State agreed to challenges for cause as to certain venire persons, some of whom were African-Americans. A limited number of qualified African-American prospective jurors remained in the jury pool after the agreed challenges. During individual voir dire, the State questioned Cobb about her response to a questionnaire item that asked whether she supported the death penalty. Cobb had written that she supported the death penalty only for certain offenses such as serial killings and acts of terrorism.

After a lengthy voir dire exchange in which Cobb appeared to vacillate in her responses, the State exercised a peremptory challenge. Cummings objected to the challenge claiming a *Batson* violation, and the State requested that Cummings meet his obligation to

---

[14] *Id.* at 94–95.

[15] *Id.* at 97–98.

[16] *Id.* at 98.

[17] *Watkins v. State*, 245 S.W.3d 444, 447–48 (Tex. Crim. App. 2008).

show a prima facie case. Cummings explained that Cobb was one of the few African-Americans to be individually questioned and one of the few African-Americans who remained qualified to sit on the jury. The judge ruled that Cummings failed to make a prima facie case and denied the *Batson* challenge. The State then requested an opportunity to put its race-neutral reasons for the challenge on the record even though the judge had already overruled the *Batson* challenge. The judge allowed the State to make a record, in which the State cited Cobb's vacillation on whether she could impose the death penalty for a non-shooter. Following the individual voir dire of several other jurors, the judge reiterated that Cummings failed to make a prima facie case regarding Cobb and clarified that this failure was why he denied the *Batson* challenge.

Cummings argues that, because the State gave race-neutral reasons for the peremptory challenge, it waived *Batson*'s requirement that he make a prima facie case of purposeful racial discrimination. In support of his position, Cummings cites *Malone v. State*,[18] in which this Court held that when the State gives race-neutral reasons for a challenged strike and the judge rules on the ultimate issue of intentional racial discrimination, the issue of whether the defendant established a prima facie case of racial discrimination becomes moot. However, this case is distinguishable from *Malone.* Here, the prosecution offered its race-neutral reasons for record purposes after the trial judge had already ruled that Cummings had failed

---

[18] 919 S.W.2d 410, 412 (Tex. Crim. App. 1996) (following *Hernandez v. New York*, 500 U.S. 352 (1991)).

to meet his prima facie burden. It is clear from the record that the judge overruled the *Batson* challenge because Cummings failed to meet his prima facie burden. In *Malone*, the judge explicitly overruled the *Batson* motion based upon race-neutral reasons.

Cummings further argues that, even if the State did not waive the prima facie case requirement, the judge erred in holding that he did not meet his burden. Relying on *Adanandus v. State*,[19] Cummings asserts he established a prima facie case. *Adanandus* is not on point. In *Adanandus*, the State excluded the only qualified African-American venireperson by using a peremptory challenge. This Court held that the exclusion established a prima facie case of purposeful racial discrimination.[20] However, in this case, Cummings did not claim or show that Cobb was the last remaining qualified African-American on the panel when he proffered the *Batson* challenge. Cummings stated only that Cobb "is one of the only African American jurors on this panel that we've even gotten close to qualifying." He acknowledged that every African-American before Cobb had been dismissed due to the parties' agreed-upon challenges for cause or excuses. Cummings did not establish an inference of discrimination.[21] The judge did not err in holding that Cummings did not establish a prima facie case. Point of error two is overruled.

---

[19] 866 S.W.2d 210 (Tex. Crim. App. 1993).

[20] *Id.* at 223 n.10.

[21] *See Miller-El v. Dretke*, 545 U.S. 236, 239 (2005) (looking at the totality of the relevant facts about a prosecutor's conduct in determining if they give rise to an inference of discrimination).

In point of error three, Cummings posits that the judge erred in excluding photographs of individuals wearing red clothing and making distinctive hand gestures. Through Defense Exhibits 1 through 4, Cummings sought to rebut evidence of his gang membership introduced earlier by the State.

During its case-in-chief, the State presented testimony regarding Cummings's motive for targeting one of the victims, Keenan Hubert. In April 2010, Cummings's friend, Emuel Bowers, was shot and killed. Rumors circulated that Hubert killed Bowers, but the police had insufficient evidence to charge him with the offense. Cummings thereafter took a personal interest in determining who was responsible for his friend's death.

At Bowers's funeral, Cummings and many of the other mourners wore the same distinctive red military-style shirt. Photographs from the funeral introduced into evidence also showed the mourners displaying specific hand gestures. Photographs of Bowers before his death showed him making these same hand gestures and, in one photograph, holding a pistol-grip shotgun. Waco Police Detective Michael Alston testified that the hand gestures were consistent with gang signs.

Cummings offered Defense Exhibits 1 through 4 during his cross-examination of Deontrae Majors, a surviving victim of this crime. Exhibit 1 consists of a screen shot of Majors's Facebook home page containing multiple sections of text (most of which are out-of-court statements made by Majors or others) and over 45 photographs or icons, two of which show the subjects making hand gestures. Majors authenticated the exhibit as a screen shot

of his home page.  Exhibit 2 is a photograph of victim Hubert (a.k.a. Lockie) with the following text on and next to the picture: "LIL LOCKIE AKA HOOD STREET GANGSTA," "MY NIGGA MY DAWG MY FRIEND," and "E.S.H.B. RIDIN 4 U 4 LIFE." Exhibit 3 is a photograph of Majors "flipping the bird."  Exhibit 4 is a collage containing eight different photographs of several individuals; the title at the top of the page reads "Cummings: Photos of V from Facebook," and the words, "RIP LIL LOCKIE ESHB 4 LIFE," run through the middle of the collage.  The State objected that the exhibits were irrelevant, more prejudicial than probative, and contained hearsay.

Cummings responded that the exhibits were relevant because "the State ha[d] made a big deal about the fact that [Cummings] and some of his friends dress primarily in red" and the photos showed that it is not just Cummings and his friends who wore red all the time. However, Cummings conceded that the shirts in the exhibits were not the same type of red military-style shirts that he and his friends were shown to be wearing at Bowers's funeral. Cummings next argued that the photos were relevant because the exhibits showed Majors and his friends "throwing gang signs."  He argued that this demonstrated that these signs were simply common for young men in that area to use and did not prove gang membership. Cummings did not address the State's "more prejudicial than probative" and hearsay objections.  The trial judge sustained the State's objections.

We review a trial judge's ruling on the admissibility of evidence for abuse of discretion, meaning it will be reversed only if the decision is outside the zone of reasonable

disagreement.[22] The proponent of the evidence has the burden to prove that the proffered item or testimony is admissible.[23]

Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Photographs offered as evidence should assist the jury with its decision, adding something that is relevant, legitimate, and logical to the testimony that accompanies it and that assists the jury in its decision-making duties.[24]

The judge did not err in excluding the photographs in question. Whether the individuals shown in the photographs were in a gang was not an issue at trial. Further, Cummings never explained, either at trial or on appeal, how photographs of the victims, Majors, and others wearing the color red and "throwing gang signs" would establish that Cummings was not a member of a gang. Cummings's argument—that because other young men make the same hand gestures and also wear the color red as Cummings and his acquaintances necessarily proves that all young men in the community are not gang members—is not persuasive. The photographs are not relevant to rebut the State's inference that Cummings and his acquaintances were gang members. Because we hold that the

---

[22] *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001).

[23] *See Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008).

[24] *Erazo v. State*, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004).

exhibits were not relevant, we do not need to address alternate legal bases for the exhibits' exclusion. Point of error three is overruled.

In Cummings's fifth point of error, he alleges that the judge erred by overruling his objection to the State's cross-examination question of a defense witness that introduced a highly prejudicial fact not in evidence. During the guilt phase, Cummings suggested through cross-examination that a key eyewitness to Cummings's presence at the crime scene was paranoid and delusional. Cummings sought to bolster this conclusion through the testimony of a mental-health expert. During its cross-examination of the expert, the State sought to show that the eyewitness was not paranoid or delusional given the circumstances she encountered.

Nickoll Henry testified for the State as an eyewitness. Henry lived with her children in a bottom-floor apartment of the complex where the offense occurred. Henry testified that on the evening of March 28, 2011, she had fallen asleep on her couch and was awakened by the sounds of gunfire and a bullet grazing her leg. She jumped up as Marion Bible and Majors, fleeing from the attack, threw open her front door, ran in, and tried to slam the door shut. Henry limped to the door and peeped out of it—it was then that she saw Cummings standing ten feet away attempting to unjam a gun. Cummings looked up and saw Henry; their eyes met. She immediately slammed the door shut and locked it.

Henry was familiar with Cummings, having seen him around the apartment complex from time to time when he was visiting his grandmother. She was also familiar with

Cummings's brother, Tyrece Richards. When she saw Cummings outside her door with the gun, she called 9-1-1, believing that Cummings was going to come in and kill her, her children, and everyone in the house. Later that night, she found a .45-caliber cartridge in her apartment—possibly from when Cummings was attempting to rack the slide of his gun to unjam it when he was outside her door.

Henry saw Cummings return to the crime scene later that night wearing different clothing. She did not talk to the police about Cummings on the night of the offense because she knew Cummings had seen her and she was even more frightened when he returned to the scene. However, after finding two empty shell casings and a live nine-millimeter round placed on her doorsill the next day, she contacted the police. She believed that leaving the casings and live round was meant to be a threat. Before Cummings's trial, Henry was arrested for a probation violation and placed in the county jail. While there, Tyrece Richards's girlfriend, Jasmine Flowers, who was in the next cell, threatened Henry's life because of her upcoming testimony against Cummings. Flowers was moved because of the threat.

Henry also disclosed that she suffers from mental illness, including post-traumatic stress disorder (PTSD) and paranoid schizophrenia. During cross-examination, Cummings accused Henry of omitting "borderline personality disorder" from her diagnoses. He also elicited that Henry had been "hearing voices" since the murders and that she has a history of marijuana use. He had her specifically read aloud the phrase "paranoid delusions" from her

medical records.

During his case-in-chief, Cummings called Dr. William Lee Carter, a psychologist, to testify as an expert on mental illness. Dr. Carter explained borderline-personality disorder to the jury and testified that the jury should consider such a diagnosis when evaluating a witness's testimony. Dr. Carter said that the disorder could cause a person to be "dramatic and showy in displaying their emotions," as well as causing emotions to be erratic, thus drawing attention to oneself.

In preparing for his testimony, Dr. Carter reviewed Henry's medical records and noted that she had been diagnosed with schizophrenic disorder and PTSD at a Dallas mental-health facility. The Dallas facility had not diagnosed her with borderline personality disorder, but a similar disorder instead. A different facility made the borderline-personality-disorder diagnosis. Within the records provided to Dr. Carter was Henry's statement that "one of the guys was after her." The following colloquy then occurred:

| [State]: | Well, are you aware that [Cummings's] brother, Tyrece Richards, is currently wanted for retaliation on Jacqueline Rocha [Henry's niece and roommate]? |
| --- | --- |
| [Defense]: | Your Honor, I'm going to object to that. That's not in evidence and it's highly improper. |
| [State]: | Judge, they are attempting to impeach Ms. Henry's credibility. I'm attempting to re-bolster Ms. Henry's credibility based on the fact that she was, in fact, in fear because of the retaliation charge by [Cummings's] brother. |
| [Defense]: | That's not in evidence, Your Honor, and it's not in the records. |

[State]: I'm asking the doctor if he knew. It's cross-examination, Your Honor.

[COURT]: Overruled.

[Witness]: I do not know that.

[State]: And if that were the case, Ms. Henry's concern or her fears would have been consistent with someone who is scared or has fear because of her testifying at this trial?

A. Correct.

Q. That wouldn't be some schizophrenic episode if that were actually true, would it?

A. No.

Q. All right. It makes rational sense?

A. Yes.

No further mention was made of Richards's retaliation warrant.

Cummings was attempting to impeach Henry's testimony by having Dr. Carter testify about how her borderline-personality disorder might make her overly emotionally dramatic, thereby suggesting that she might be overdramatizing her fear and anxiety and exaggerating her testimony. When a witness's credibility has been attacked by proper impeachment, the sponsoring party may rehabilitate the witness in direct response to the attack.[25] Furthermore, the opposing party is entitled to cross-examine an expert witness concerning the facts and

---

[25] *Michael v. State*, 235 S.W.3d 723, 726 (Tex. Crim. App. 2007).

data upon which that expert relied in forming his conclusion or opinion.[26] In this case, Cummings "opened the door" for the State's inquiries into specific reasons why Henry's testimony was credible. The State was entitled to question Dr. Carter about information he relied upon in reaching his conclusions. The query was not offered to show Cummings's guilt, but to show that Henry's fears for herself and her family were legitimate and not the result of a delusion or other mental issue.

Even assuming the judge erred in permitting the State's cross-examination, Cummings was not harmed.[27] Cummings complains that, by cross-examining Dr. Carter with this matter, the State introduced evidence that jurors necessarily would recognize as witness intimidation, with broader implications toward Cummings's culpability. However, there was already unobjected-to witness intimidation evidence before the jury relating to the fact that Tyrece Richards's girlfriend threatened Henry's life because of her potential testimony in Cummings's trial. Further, someone left a live round of ammunition and two other shell casings on Henry's doorsill the morning after the murders. Henry testified that she believed this was intended as a threat. Given this other evidence, we find that the State's question regarding Richards's retaliation did not have a substantial and injurious effect or influence in determining the jury's verdict.[28] Point of error five is overruled.

---

[26] TEX. R. EVID. 705(a).

[27] *See* TEX. R. APP. P. 44.2(b).

[28] *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). *See also*

(continued...)

In his fourth point of error, Cummings contends that the judge erred by admitting hearsay evidence that co-defendant Albert Love's girlfriend purchased an AK-47 assault rifle that was used in the shooting. Assuming without deciding that the judge erred, we hold that Cummings was not harmed by the statement's admission.

During the State's direct examination of another surviving victim of this crime, Marion Bible, the following exchange occurred in pertinent part:

[State]: I want to ask you if about a week after [the shootings] happened whether you had occasion to speak with Detective Steve January at the Waco Police Department.

A. Uh huh.

Q. One thing I'll ask you to do is say either "yes" or "no" for the court reporter. Is that a yes?

A. Yes, sir.

. . . .

Q. Now, you indicated earlier that you knew a person by the name of Albert Love. Right?

A. Yes, sir.

Q. Besides knowing him through his association with [Cummings], you said that you had lived there at the Villa Victoria Apartments when you got back from the Gary Job Corps. At some point did you learn that Albert Love was actually living at

---

[28](...continued)
*Anderson*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) (holding that improper admission of evidence does not constitute reversible error if same facts proved by other properly admitted evidence).

the Villa Victoria also?

A.       Yes, sir.

Q.       And do you remember who he was living there with?

A.       Yes, sir.

Q.       What was the girl's name that he was living with?

A.       Takeila.

. . . .

Q.       All right. And by the time that you had – by the time you talked with Detective January there on April 6th, had you begun to hear things concerning [a] possible purchase of weapons either by Albert Love or by Takeila?

A.       Yes, sir.

Q.       And did you tell Detective January about that during that meeting?

A.       Yes, sir.

Q.       I'm not going to go into exactly the question that he asked, because that would be hearsay, but tell me, what did you tell Detective January concerning that when you met with him?

A.       I'm not sure. It depends on the question he asked me.

Q.       Well, let me just say this –

[Defense]:   Your Honor, I'm going to object. This is all hearsay.

THE COURT: Let me hear the question first.  Don't answer anything. Just let me hear the question.

[State]:   Did you ever tell Detective January that Takeila had possibly

purchased an AK-47 rifle for Albert Love?

[Defense]: Objection, Your Honor. The answer to this is going to elicit hearsay.

[COURT]: State have a response?

[State]: Your Honor, I'm not asking—what I'm—I'm asking for the statement that he made.

[Defense]: Which he made out of court, Your Honor.

[State]: It's a statement of this witness, Your Honor. I mean, she will have an opportunity to cross-examine him on it if she wishes. I'm not asking—

[Defense]: But, Your Honor, the answer is based on hearsay.

THE COURT: On his statement?

[Defense]: The answer that he is going to give to this question is based on information that's hearsay.

THE COURT: Overruled.

[State]: Did you ever make a statement like that to Detective January?

A. Yes, sir.

The State did not question Bible any further regarding that subject.

Hearsay is any statement, other than one made by the declarant while testifying at a trial or a hearing, offered to prove the truth of the matter asserted.[29] Hearsay is not

---

[29] TEX. R. EVID. 801(d).

admissible unless it meets a clearly established hearsay exception.[30]

The State argues Cummings procedurally defaulted this alleged error, if any, by failing to object in a timely manner.[31] The State contends that, to properly preserve the error, Cummings should have objected when the prosecutor asked Bible whether he had heard things about the possible purchase of weapons by Albert Love or Takeila. We disagree with the State's argument. Failing to object to the State's earlier question did not forfeit the alleged error in permitting Bible to testify what he told Detective January.

Cummings objected to the question of whether Bible told Detective January that Love's girlfriend, Takeila, possibly purchased an AK-47. We assume, without deciding, that the question was objectionable because it arguably called for a response based on hearsay and the admission of the response over Cummings's objection was erroneous. However, we find the assumed error to be harmless. Texas Rule of Appellate Procedure 44.2(b) mandates that we must disregard the error as long as it is not of constitutional magnitude and did not affect Cummings's substantial rights.[32] This Court treats a violation of the evidentiary rules that results in the erroneous admission of evidence as non-constitutional error.[33] Cummings's

---

[30] TEX. R. EVID. 802.

[31] TEX. R. EVID. 103(a)(1).

[32] TEX. R. APP. P. 44.2(b).

[33] *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1999) (applying Rule 44.2(b) harm analysis to erroneous admission of hearsay evidence); *King*, 953 S.W.2d at 271 (same).

substantial rights are affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[34] Thus, we will disregard the error unless it affected Cummings's substantial rights.

It is well established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other evidence admitted without objection.[35] The substance of the contested question and corresponding answer—that Bible heard "things" about the possible purchase of weapons either by Albert Love or by Takeila—had already been elicited by the State without objection.[36] Bible's testimony that he repeated to Detective January the things that he heard added little to the previously admitted evidence. The damage to Cummings, if any, had been done already. The only substantive difference between the objected-to question that Bible answered without objection and the contested question was the specific identification of a particular firearm—an AK-47. Even so, the only connection between Cummings and an AK-47 was a picture of a woman sitting in the rear seat of Cummings's car holding an AK-47 and witnesses' testimony that they saw an AK-47 in the rear seat of Cummings's car. The State's theory of the case was that Cummings, along with two others, fired different weapons into the victim's car, only one of which was an AK-

---

[34] *See King*, 953 S.W.2d at 271.

[35] *See Anderson*, 717 S.W.2d at 628.

[36] *See Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998) (stating that "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.").

47. But the State's theory of the case did not include directly tying Cummings to the firing of an AK-47. In fact, the State emphasized Cummings's self-professed love of his .45-caliber pistol that he often carried and that Cummings most likely used it in carrying out the attack. This argument was buttressed by Nickoll Henry's testimony that immediately after being grazed by one of the bullets she saw Cummings standing outside her apartment door holding a .45-caliber pistol and trying to free the jammed pistol.

We conclude that the effect of the assumed error in admitting Bible's statement to Detective January that Love's girlfriend Takeila may have purchased an AK-47 for Cummings's co-defendant is minimal in light of the weighty evidence that Cummings actively participated in the shootings in addition to the strong inference that he most likely did so with a different firearm. Therefore, we hold that the judge's assumed error in admitting the testimony did not have a substantial influence on the jury's verdict. Point of error four is overruled.

In points of error six through nine, Cummings raises several challenges pertaining to the Texas death-penalty scheme. In point of error six, Cummings asserts that the judge erred in overruling his request to refrain from giving the instruction required by Article 37.071, § 2(f)(4), which defines mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." In points seven and eight, Cummings argues that the judge erred in denying his requests to define the "vague" terms "personal moral culpability" and "moral blameworthiness" in the punishment charge. Finally, in point nine,

he asserts that the judge erred in denying his request to define the word "probability" as it relates to the future-dangerousness issue. Cummings concedes that we have previously rejected these issues,[37] and we are not persuaded to reconsider them. Points of error six, seven, eight, and nine are overruled.

We affirm the trial court's judgment.

DELIVERED: December 17, 2014

DO NOT PUBLISH

---

[37] *See Busby v. State*, 990 S.W.2d 263, 272 (Tex. Crim. App. 1999) (mitigating evidence is evidence that might be regarded as reducing moral blameworthiness); *see also King*, 953 S.W.2d at 274; *Davis v. State*, 313 S.W.3d 317, 355 (Tex. Crim. App. 2010) ("personal moral culpability," "moral blameworthiness," and "probability" need not be defined).